## NEWCOMB v. ARMOUR & CO.
### No. 94 Civil Action.

District Court, M. D. Pennsylvania.
June 30, 1941.

Leo W. White and Jarrett W. Jennings, both of Pittston, Pa., for plaintiff.

Ben R. Jones, Jr., and Edward Darling, both of Wilkes-Barre, Pa., for defendant.

JOHNSON, District Judge.

This is an action of trespass by Marion Newcomb to recover damages resulting from defendant's alleged negligence in manufacturing frankfurters containing particles of wire. The case was tried before the court without a jury, and the parties have presented requests for findings of fact and conclusions of law. From all the evidence the court finds the following

## I. Facts

1. Plaintiff is a citizen and resident of the Commonwealth of Pennsylvania. Defendant is a corporation incorporated under the laws of the State of Illinois. The matter in controversy exceeds, exclusive of interest and costs, the sum of three thousand dollars. Complaint, paragraph 1 and Answer.

2. On May 21, 1938, plaintiff was 30 years old, a registered graduate nurse with eight years of experience, possessing twenty-eight of her natural teeth, four having been extracted at intervals some years before: Trial Record, pages 3, 16, 51.

3. Defendant is a manufacturer of meat and meat products, having a branch plant in Wilkes-Barre, Luzerne County, Pennsylvania. Among other products, the plant at Wilkes-Barre, on or before May 21, 1938, manufactured "skinless frankfurters", intended for human consumption, which after wrapping and packaging, it delivered to retail stores for sale to the public. On May 20, 1938, defendant sold some "skinless frankfurters" manufactured at its Wilkes-Barre plant to the store of the Great Atlantic & Pacific Tea Co., in Pittston, Luzerne County, Pennsylvania: Trial Record, pages 57-59, 137, 149, 155, 278.

4. On May 20, 1938, Eugene J. Sullivan was the manager of said store in Pittston. On that date, the Great Atlantic & Pacific Tea Company, upon receiving the aforesaid frankfurters from defendant at the Pittston store, placed the original package and its contents in a wood, glass and tile refrigerated display case, where they were not disturbed except when called for by a customer. On this date, the only frankfurters sold by the said A. & P. store were those manufactured by the defendant: Testimony of Eugene J. Sullivan, Trial Record, pages 60-64; Defendant's Exhibit #2.

5. On the evening of May 21, 1938, plaintiff purchased some of defendant's frankfurters from the Pittston store of the Great Atlantic & Pacific Tea Company, the clerk in that store handling them in such manner as to prevent any foreign substance entering them. Plaintiff returned to her home, heated the frankfurters and served them upon a china platter, meanwhile handling them in such manner as to prevent any foreign substance entering them: Testimony of Plaintiff, Trial Record, pages 4-6; Testimony of Eugene J. Sullivan, Trial Record, pages 60-63; Testimony of Thomas J. Casey, Trial Record, pages 75, 85.

6. While plaintiff, her mother and Thomas J. Casey were eating these frankfurters, plaintiff experienced a piercing sensation in her lower left jaw. Examination disclosed that the frankfurter plaintiff was eating, the frankfurter being eaten by Thomas J. Casey, and one frankfurter remaining on the china platter, contained small pieces of fine wire: Testimony of Plaintiff, Trial Record, pages 6-10; Testimony of Thomas J. Casey, Trial Record, pages 76-80; Testimony of Eugene J. Sullivan, Trial Record, page 63; Plaintiff's Exhibit #1; Defendant's Exhibit #2.

Testimony of plaintiff:

"A. I believe it was about the third one I had eaten, the frankfurter, when I discovered this piercing feeling, and I put my hand up to my mouth and I took out this piece of frankfurter, and there was a wire in it. * * *

"Q. You said you then noticed another wire in the piece of frankfurter you had not eaten which was part of the one you had been eating, you then saw a wire? A. Yes. * * *

"Q. Then what happened? A. Someone else had discovered a wire.

"Q. Who was that? A. Mr. Casey.

"Q. He was present? A. Yes, he was present.

"Q. He was eating frankfurters? A. He was eating, and he took out this frankfurter, and there was several pieces, small pieces of wire in that. * * *

"Q. You found several pieces of wire in Mr. Casey's frankfurter? A. Small pieces of wire.

"Q. Then you say there was one more frankfurter left? A. Yes.

"Q. Was that in the pan? A. It was on the platter.

"Q. On the platter? A. Yes.

"Q. Were you all seated around a table eating? A. Yes.

"Q. And what did you do with that frankfurter? A. I just took a small knife and I cut it open lengthwise, and as I did, the knife grated, and there were several small pieces of wire through the center of it." Trial Record, 6, 8, 9-10.

Testimony of Thomas J. Casey:

"Q. You said now she (plaintiff) bit into a frankfurter? A. Right.

"Q. And what did she say? A. Ouch. * * *

"Q. What did she do with reference to the frankfurter she was eating? A. The frankfurter?

"Q. Yes. A. Why, she broke it open.

"Q. As to the part she had bitten, what did she do? A. She took it out of her mouth.

"Q. When she took it out of her mouth, did you observe it? A. Yes.

"Q. What was it? A. There was a wire in it, in the frankfurter.

"Q. Whether or not it was attached to anything? A. It was attached—what do you mean?

"Q. Was it attached to a piece of frankfurter? A. To a piece of frankfurter.

"Q. And she took it from her mouth? A. She took it from her mouth.

"Q. Did you see the wire? A. Yes. * * *

"Q. What did Miss Newcomb do with reference to the remaining part of the frankfurter she had been eating? A. She broke it open.

"Q. Did you see it? A. Yes, I did.

"Q. What did you observe? A. I observed wire in it. * * *

"Q. You had been eating frankfurters, Mr. Casey, at the same time? A. Yes.

"Q. And will you describe what happened? A. I bit into one piece of wire.

"Q. You bit into a frankfurter? A. With a wire into it. * * *

"Q. What did you do with the piece you took out of your mouth, as well as the unconsumed portion you hadn't yet bitten into? A. Broke it open.

"Q. What did you find in that frankfurter? A. There was pieces of wire in it, too. * * *

"Q. Mr. Casey, how many frankfurters were yet left on the plate at that time? A. There was one more left.

"Q. And what, if anything, did you do with respect to that frankfurter? A. We broke it open.

"Q. Broke it open or cut it open? A. Well, cut it open, and found wire in it.

"Q. What did you observe in that frankfurter? A. Wire also.

"Q. How many pieces? A. I couldn't recollect how many pieces. There was more than one." Trial Record, pages 76-79.

Testimony of Eugene J. Sullivan, manager of the A. & P. Store at Pittston, Pennsylvania, where the frankfurters were purchased:

"Q. What did she (plaintiff) show you, if anything? A. She had a piece of wire and a piece of frankfurter with her.

"Q. Whether or not the frankfurter, a piece of the frankfurter, was attached to the piece of wire? A. Well, there was a little meat attached to the piece of wire she showed me." Trial Record, page 63.

7. One piece of wire penetrated plaintiff's gum in her lower left jaw between the first and second bicuspid teeth: Testimony of Plaintiff, Trial Record, page 14; Testimony of Dr. Coyne, Trial Record, pages 106, 107, 118.

Testimony of plaintiff:

"A. * * * On Tuesday, it was so terribly painful I figured I had better go to a dentist, which I did, and I went to Dr. Coyne, and I told him the experience I had had, and of course he probed around and removed this foreign body.

"Q. What was it? A. He removed a small piece of wire.

"Q. From where? A. From over on the lower part of my jaw, right in through here (indicating)." Trial Record, page 14.

Testimony of Dr. Coyne:

"Q. What did you find? A. I found a wire in the gum, a piece of wire.

"Q. Where was this wire located? A. Well, it was located in the lower jaw, in the bicuspid area.

"Q. Where in the bicuspid area? A. It was between the first and second bicuspid, the lower jaw.

"Q. This piece of wire was lying between the lower left first and second bicuspid teeth? A. Yes.

"Q. Was it in the gum or between the teeth? A. Both, imbedded down there between the teeth in the gum. It wasn't visible." Trial Record, page 106.

8. The penetration of the wire into plaintiff's gums was the proximate cause of an infection thereof, which, despite usual medical treatment, spread throughout plaintiff's jaws, causing the removal of all of plaintiff's natural teeth, in order to clear the infection and prevent other physical complications. Testimony of Dr. Coyne, Trial Record, pages 108-112, 114-117, 131, 134; Testimony of Dr. Walsh, Trial Record, pages 93, 94, 99, 100, 103; Testimony of Plaintiff, Trial Record, page 16.

Testimony of Dr. Coyne:

"Q. Doctor, from your experience with this case, as well as your professional experience, what, in your opinion, professionally, was the cause of this infection? A. Well, I would say this wire. * * *

"Q. Doctor, was it your professional opinion that the infection you have described necessitated the removal of the teeth in order to check the infection? A. Yes. * * *

"Q. So that on the 7th of July (1938), when you took her to the hospital, you extracted all the teeth? A. Twenty-eight teeth.

"Q. Both upper and lower jaw? A. Yes. * * *

"Q. (referring to date of extraction) What was the condition of the gums? A. There was suppuration there, pus. * * *

"Q. Was there infection in this area? A. Yes.

"Q. Was it what we might call a localized infection? A. No. If it was localized, I might have mastered it.

"Q. What was the extent of infection? A. I would say in four or five days the infection spread to two or three adjacent teeth on each side until it went where I couldn't stop it. * * *

"Q. And it was what you might term a virulent infection? A. Yes, because it spread very rapidly, to such an extent it had to be. * * *

"Q. When did it go from the lower to the upper, or about when? A. Well, I would say probably five or six weeks. * * *

"Q. And doctor, why for a period of a month and a half didn't you have an x-ray made? A. Because I was hoping to check the infection. I had had similar cases without an x-ray that responded to treatment. I can quote six or eight right here in Pittston and name them in full. * * *

"Q. After the extraction of the teeth, what effect did you notice in her condition? A. Well, we had drainage immediately.

"Q. And did the infection clear up? A. Well, over a period of time. It didn't clear up immediately, because it was long standing and a few months brewing. You wouldn't expect it to clear up over-night.

"Q. Her condition then over a period of time improved as the infection left her? A. Yes." Trial Record, pages 108-112, 117, 134.

Testimony of Dr. Walsh (referring to plaintiff):

"Q. And did she discuss with you the removal of her teeth? A. Oh, yes.

"Q. And what was your advice to her? A. My advice was to remove them.

"Q. Was it your opinion that her toxic condition arose from the inflammation in her teeth? A. By the process of elimination, yes.

"Q. Based upon what? A. That her symptoms were toxic in origin. * * * A. My advice for removal was because of the toxic condition that didn't seem to improve under dental care, and apparently, from my point of view, as a physician, from looking at the mouth, there was apparently an increase rather than any decrease in the condition of the mouth, and from her general condition, to remove that focus of infection, to prevent any complications generally." Trial Record, pages 93, 99, 100.

9. As a result of the penetration of the wire into plaintiff's gums, the resultant infection, and the extraction of teeth, plaintiff incurred medical bills, suffered loss of earnings, permanent loss of her teeth, and endured pain and suffering. Trial Record, pages 17, 20-28, 54, 91-92, 94, 104, 112, 113, 117, 120.

10. The presence of the piece of wire in the frankfurter eaten by plaintiff was due to the negligence of the defendant in the manufacture of said product. The package, the product and all of its ingredients were in the exclusive control of the defendant until the product reached plaintiff's hands. Trial Record, pages 4-6, 60-64, 75, 85, Defendant's Exhibit #2.

11. Plaintiff is entitled to recover from defendant the sum of $336 for medical expenses incurred because of defendant's negligence.

12. Plaintiff is entitled to recover from defendant the sum of $780 for loss of earn-

ings resulting from defendant's negligence; being 156 days lost @ $5 each.

13. Plaintiff is entitled to recover from defendant the sum of $5,000 for all other and permanent damages, including pain, suffering, inconvenience, injury to health and appearance, caused by defendant's negligence.

14. Plaintiff is entitled to recover from defendant her costs in this suit.

From the above facts the court arrives at the following

## II. Conclusions of Law

1. Since the frankfurters in question were manufactured, sold, consumed, and the injury suffered in Pennsylvania, the law of the Commonwealth of Pennsylvania controls: Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Bissonette v. National Biscuit Company, 2 Cir., 100 F.2d 1003.

2. Defendant, a manufacturer of food for human consumption, owed a high degree of care to see that the food was free from foreign or deleterious substances that might injuriously affect the user. This duty was owed by the defendant manufacturer to the plaintiff, a member of the public injured thereby: Rozumailski v. Philadelphia Coca-Cola Bottling Co., 296 Pa. 114, 145 A. 700; Quinn v. Swift & Co., D.C.M.D.Pa. 20 F.Supp. 234, Johnson, D. J., and cases there cited.

3. Defendant, a manufacturer of food for human consumption, owed to plaintiff the duty of reasonable inspection of its commodity before placing it upon the market for consumption: Rozumailski v. Philadelphia Coco-Cola Bottling Co., supra; Quinn v. Swift & Co., supra.

4. From facts 3, 4, 5, and 10, the accident proves its own negligent cause, and negligence can be inferred; there is no necessity for showing the particular dereliction of the defendant: Rozumailski v. Philadelphia Coca-Cola Bottling Co., supra; Quinn v. Swift & Co., supra.

5. In an action for injury from the consumption of food intended for human consumption, the test of whether the evidence is sufficient to support a verdict for the plaintiff is whether the circumstances are such as would satisfy a reasonable and well-balanced mind that the accident resulted from defendant's negligence: Rozumailski v. Philadelphia Coco-Cola Bottling Co., supra; Quinn v. Swift & Co., supra.

6. A manufacturer of food for human consumption must use all reasonably scientific and up-to-date methods to obviate the presence of any injurious substances, but even where such methods are employed and such substances get into the product, whose presence there might possibly be due to that uncertain human quality—carelessness—somewhere along the line, the manufacturer is responsible to a member of the public injured thereby: Rozumailski v. Philadelphia Coco-Cola Bottling Co., supra.

## Discussion

1. *Presence of wire in frankfurter eaten by plaintiff.*

There is the positive testimony of plaintiff, Mr. Casey and Eugene J. Sullivan, manager of the A. & P. store in Pittston, that there were pieces of wire in the frankfurter eaten by the plaintiff. See fact No. 6 above. Corroborating this is the testimony of Dr. Coyne that he extracted a wire from plaintiff's gum: Trial Record, page 106. The defendant has suggested that it is "fantastic" that out of eight or ten frankfurters purchased at one time, only three contained wire. This is no answer. The court is satisfied from all the evidence that wire was present in the frankfurters. Furthermore, plaintiff's testimony, referred to under facts Nos. 4, 5, and 10 established with as much certainty as required, that the presence of the wire was not due to any other cause than negligence in manufacturing. It is also no answer that defendant proved it used all approved methods to prevent just such occurrences as this, as explained under conclusion of law No. 6 above. The fact remains that the wire was there through defendant's negligence. Negligence in this case can be inferred as explained under conclusions of law Nos. 4 and 5 above.

2. *Penetration of wire into plaintiff's gum.*

Plaintiff's testimony and the testimony of her dentist, quoted and referred to under fact No. 7 above, support the conclusion that the wire did penetrate plaintiff's gum. This is further corroborated by the expert opinion of Dr. Touhill, that a wire such as this could penetrate a normal, healthy gum under the sudden pressure of the force of mastication: Trial Record, pages 311, 312. To answer this, defendant produced two dentists, Drs. Flanagan and Miller, neither of whom had examined the plaintiff prior to May 21, 1938, but both stated

their opinion that a wire such as described could not penetrate a normal, healthy gum: Trial Record, pages 223, 253, 254. The average layman, from personal experience, knows how easy it is for any sharp point to penetrate a normal gum. The point of a toothpick, or a bristle of a toothbrush may pierce a gum sufficiently to cause bleeding and pain. The court is convinced from the weight of the testimony that the wire did in fact pierce plaintiff's gum.

### 3. Cause of extraction of plaintiff's teeth.

There is no dispute in the testimony that the cause of extraction of plaintiff's teeth was an infection. The point of conflict is whether that infection resulted from penetration of plaintiff's gum by a wire from defendant's frankfurter, or from some prior unhealthy condition of plaintiff's mouth. Plaintiff's dentist who had attended her for five years before the accident, as well as her dentist who attended her before that time, testified that periodic inspections of reasonable frequency had never revealed anything but a normal, healthy condition of plaintiff's mouth and gums: Trial Record, pages 105, 119, 123-125, 129, 275. Dr. Coyne had examined plaintiff's mouth and her X-ray plate of April, 1938 and both showed a normal, healthy mouth: Trial Record, pages 123-125, 129. Dr. Coyne further stated that it was his opinion that the wire had caused the infection, and that he had seen infection travel a similar course in the mouth before, more than once: Trial Record, pages 117, 132, 134. Dr. Walsh, a medical doctor consulted by plaintiff after the occurrence, when she suffered general bodily pains, reported several weeks after the accident "marked pyorrhea" in plaintiff's mouth. However, he stated he had made only a cursory inspection of her mouth, as he was making no attempt to prescribe for her dental needs, and that to him "marked pyorrhea" meant a pussy infection of the gum throughout plaintiff's mouth. He further stated that his inspection indicated the condition was acute, not chronic: Trial Record, pages 97, 98.

To meet this testimony, defendant called Drs. Bruno, Flanagan and Miller. Dr. Bruno, roentgenologist at the Pittston Hospital, testified that he had glanced at X-ray pictures taken of plaintiff's mouth at the hospital on April 27, 1938, before the occurrence in question, and that he had noticed alveolar absorption and some caries on the plates. The doctor stated that "this is not a true report, because this is what I got at a glance". On cross-examination this witness stated that he didn't know if he saw the plaintiff that day, that there were no markers of identification on the X-ray pictures in the hospital darkroom, that he just took a cursory glance at it; that he couldn't recall any other case where he had taken a cursory glance at the X-ray film and two years later he was able to recite the details he had seen; and that he did not remember even the general location in plaintiff's mouth of the teeth that he saw were infected: Trial Record, pages 175, 176, 180, 183-185. This was the same X-ray film which Dr. Coyne had testified showed no unhealthy condition of the mouth upon careful examination: Trial Record, page 125.

Dr. Flanagan, called by the defendant, examined plaintiff's mouth about one year after she ate the frankfurter in question. He stated that then her mouth was in good condition, and that based only upon his examination at that time he could not express an opinion as to the health or disorder of her mouth prior to that day: Trial Record, pages 218, 219, 231, 232. Dr. Flanagan further stated that in his opinion such a wire could not have pierced the gum in a normal, healthy mouth, and therefore there must have been an unhealthy condition in plaintiff's mouth on May 21, 1938. He also stated that he had never experienced an infection which traveled in the course described here, from lower left jaw to upper left jaw to lower right jaw to upper right jaw: Trial Record, pages 223, 224. This testimony is based upon the assumption that this wire could not have penetrated a normal, healthy gum, which matter has been discussed above under the subject, "Penetration of wire into plaintiff's gum".

Dr. Miller, also called by the defendant, testified to the same effect, that he did not believe this wire could pierce a normal, healthy gum, and therefore there must have been some "predisposing factor". Dr. Miller had never examined plaintiff's mouth at any time: Trial Record, pages 253, 254.

From the above medical testimony the court is convinced that no unhealthy condition of plaintiff's mouth existed on May 21, 1938. Dr. Bruno's testimony is unsatisfactory and not convincing. Defendant argues that Dr. Bruno's testimony would be satisfactory if plaintiff had not lost those X-ray plates. This may or may not be so.

722

Defendant also uses the loss of those plates to attack plaintiff's credibility. However this may be, the loss will not attack the credibility of her dentist, Dr. Coyne, who examined them before they were lost, and gave the court the benefit of his examination. The testimony of Drs. Flanagan and Miller is based upon the assumption that this wire could not have pierced a normal, healthy gum. With this assumption the court cannot agree, for reasons heretofore stated. From the weight of the evidence, the court has decided that no unhealthy condition existed in plaintiff's mouth on May 21, 1938. This was a rusty wire which was extracted from plaintiff's mouth by Dr. Coyne, and in light of all the evidence it caused the infection and the damage of which plaintiff complains.

IV. Order of Court

And now, June 30, 1941, this court renders judgment in favor of Marion Newcomb, plaintiff, and against Armour & Company, defendant, in the sum of $6,116, together with plaintiff's costs in the suit. The Clerk of this Court is ordered to enter the said judgment as rendered.